# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JESSICA D. DOUBLEDAY,       )
                             )
      **Plaintiff,**             )
                             )      **Case No. 3:13-cv-00524**
      v.                     )      **Judge Nixon/Knowles**
                             )
CAROLYN W. COLVIN,        )
**Acting Commissioner of Social Security,**   )
                             )
      **Defendant.**           )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Insurance ("SSI"), as provided under Title XVI of the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 15. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 19.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff protectively filed her application for Supplemental Security Income ("SSI") on

August 7, 2009, alleging that she had been disabled since October 8, 2006, due to bipolar disorder, panic disorder, PTSD, endometriosis, major depressive disorder with psychosis, hypermobility syndrome, occipital neuralgia, relapsing polychondritis, and interstitial cystitis. *See, e.g.,* Docket No. 13, Attachment ("TR") 118, 178, 183.[1]  Plaintiff's application was denied both initially (TR 102) and upon reconsideration (TR 103).  Plaintiff subsequently requested (TR 125-27) and received (TR 53-101) a hearing.  Plaintiff's hearing was conducted on October 19, 2011, by Administrative Law Judge ("ALJ") Renee S. Andrews-Turner.  TR 53.  Plaintiff and Vocational Expert, Gary Sturgill, appeared and testified.  *Id*.

On December 1, 2011, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 20-52.  Specifically, the ALJ made the following findings of fact:

> 1.  The claimant has not engaged in substantial gainful activity since August 7, 2009, the application date (20 CFR 416.971 *et seq*.).
>
> 2.  The claimant has the following severe impairments: history of muscular dystrophy; fibromyalgia; interstitial cystitis; endometriosis; irritable bowel syndrome; seizure disorder; chronic headaches (occipital neuralgia); hypermobility syndrome; polychondritis; hypertension; bipolar disorder; major depressive disorder; panic disorder; history of attention deficit hyperactivity disorder; and history of polysubstance abuse (20 CFR 416.920(c)).
>
> 3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity

---

[1]Plaintiff's actual application date was September 3, 2009.  TR 167-70.  The ALJ noted Plaintiff's protective filing date in her decision (TR 23), and the undersigned does the same.
The record also contains a previous application dated January 9, 2007.  TR 164-66. Plaintiff's January 9, 2007 application is not the subject of the instant action and will therefore not be discussed herein.

of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) that is limited to occasional lifting and/or carrying of twenty pounds; frequent lifting and/or carrying of ten pounds; standing and/or walking for four hours in an eight-hour workday; sitting for eight hours in an eight-hour workday; requiring a sit/stand option; avoiding cold temperatures and unprotected heights; performing only simple, routine, repetitive tasks; interacting with coworkers, supervisors, and the public on no more than an occasional basis; and tolerating only infrequent and gradual workplace changes.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on June 22, 1984 and was 25 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.      The claimant has not been under a disability, as defined in the Social Security Act, since August 7, 2009, the date the application was filed (20 CFR 416.920(g)).

TR 25-43.

On January 6, 2012, Plaintiff timely filed a request for review of the hearing decision. TR 18-19. On February 28, 2013, the Appeals Council issued a letter declining to review the case (TR 5-10), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III. CONCLUSIONS OF LAW

### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."

4

*Bell v. Comm'r of Soc. Sec.,* 105 F.3d 244, 245 (6th Cir. 1996), *citing Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389, *citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985), *citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnoses and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which

5

Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a prima facie case of disability.
>
> (5) The burden then shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 CFR §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the Medical-Vocational Guidelines, otherwise known as "the grid," but only if the

---

[2] The Listing of Impairments is found at 20 CFR, Pt. 404, Subpt. P, App. 1.

claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. *Moon*, 923 F.2d at 1181; 20 CFR § 404, Subpt. P, App. 2, Rule 200.00(e)(1), (2). *See also Damron v. Sec'y of Health & Human Servs.*, 778 F.2d 279, 281-82 (6th Cir. 1985). Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments: mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred by failing to properly: (1) evaluate her credibility; (2) evaluate the opinions of her treating psychiatrist, Dr. Samuel Okpaku, and treating physician, Dr. Ifeanyi Obianyo, including failing to develop a full and fair record by not re-contacting Drs. Okpaku and Obianyo to clarify their opinions; (3) determine her RFC, due to the ALJ's error in considering and weighing the opinions of Drs. Okpaku and Obianyo; and (4) include all of her limitations in the hypothetical questions asked to the vocational expert. Docket No. 16. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), this action should be

reversed, or in the alternative, remanded.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and
> transcript of the record, a judgment affirming, modifying, or
> reversing the decision of the Commissioner of Social Security,
> with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

## 1.  Plaintiff's Credibility

Plaintiff contends that the ALJ failed to analyze the requisite factors when assessing Plaintiff's credibility and further contends that the ALJ's determination that she was not entirely credible was not supported by substantial evidence.  Docket No. 16, p. 17, 25.  Specifically, Plaintiff argues that the ALJ failed to explain how her "unsuccessful work attempts and limited ability to socialize" demonstrate her ability to work 5 days a week for 8 hours a day.  *Id.* at 26.  In particular, Plaintiff takes issue with the ALJ's statement that her attempts at work and education reflect her ability to perform physically, because she testified that she worked in a restaurant for

two months before they dismissed her so that she could "focus on her health." *Id.*, *citing* TR 41, 61. Plaintiff also takes issue with the ALJ's notation that Plaintiff "visits with friends, attends church and Alcoholic Anonymous meetings, has applied for jobs, and wants to go to college," because she testified that she "very rarely" visits with friends, and only attends church once a month because it is "difficult" for her to sit through the service. *Id.*, *citing* TR 41, 82-83. Plaintiff essentially contends that the ALJ's credibility determination was not supported by substantial evidence since she did not accept all of Plaintiff's testimony. *See id.*

Defendant responds that the ALJ properly assessed Plaintiff's credibility. Docket No. 19, p. 7-11. Specifically, Defendant argues that the ALJ "extensively considered [the requisite] factors in the course of a thorough evaluation of the medical and non-medical evidence of record, and determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible." *Id.* at 8-9, *citing* TR 39. Defendant further argues that, in making her credibility determination, the ALJ considered all relevant evidence of record, including Plaintiff's medications and treatment history, the objective medical evidence and opinions, and Plaintiff's subjective allegations and reported daily activities. *Id*. at 8-10. Accordingly, Defendant maintains that the ALJ's credibility determination was supported by substantial evidence and should stand. *Id*. at 10-11.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's subjective allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability . . . . There must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined

> medical condition must be of a severity which can reasonably be
> expected to give rise to the alleged pain.

*Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 852-53 (6th Cir. 1986), *quoting* S.

Rep. No. 466, 98th Cong., 2d Sess. 24 (emphasis added); *see also* 20 CFR §§ 404.1529, 416.929

("statements about your pain or other symptoms will not alone establish that you are disabled . . .

."); *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 (6th Cir. 1990) ("though Moon alleges fully

disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations . . . if the

subjective allegations, the ALJ's personal observations, and the objective medical evidence

contradict each other.").  Moreover, "[a]llegations of pain . . . do not constitute a disability unless

the pain is of such a debilitating degree that it prevents an individual from participating in

substantial gainful employment."  *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224,

1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider

the following factors and how they relate to the medical and other evidence in the record: the

claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the

precipitating and aggravating factors; the type, dosage and effect of medication; and the other

treatment or measures to relieve pain.  *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994)*,

construing* 20 CFR § 404.1529(c)(2).  After evaluating these factors in conjunction with the

evidence in the record, and by making personal observations of the claimant at the hearing, an

ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms

are not credible.  *See, e.g., Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997);

*Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Sec'y*

*of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant action, after comprehensively recounting Plaintiff's medical records and testimony (*see* TR 25-39), the ALJ ultimately determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully credible (TR 39). The ALJ explained her determination as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

> The evidence of record does not support a finding of disability. Physical examinations consistently showed no significant abnormalities, diagnostic testing showed no evidence of any cardiopulmonary disease, and the claimant was found to have no signs or symptoms associated with her high blood pressure. Additionally, the claimant reported improvement in her pain with medication and even stopped taking her blood pressure medication because she felts [*sic*] that she no longer needed it. She has since restarted taking medication for hypertension, but the medical evidence of record does not document that this condition caused any significant symptoms and/or limitations.

> Interestingly, two consultative examinations performed over a year apart, one in April 2008 and the other in December 2009, resulted in a similar finding – that the claimant could perform less than a full range of light work. While the limitations assessed by the consultative examiners were not the same, they clearly demonstrated that the claimant retained the physical ability to perform work activity.

> By February 2010, the claimant's pain had become "much more manageable," and in July 2010 she was reportedly training to be an EMT. Additionally, throughout 2010 and 2011 she sought treatment from Dr. Watson, an internist, whose records reflect little in the way of significant symptoms during periods of medical

compliance. In 2011, she was treated in the emergency room for seizures and was referred for pain management treatment. She temporarily worked as a waitress but allegedly stopped due to health reasons. However, the undersigned notes that the claimant's physical impairments did not keep her from going wakeboarding.

Regarding her mental impairments, the claimant received inpatient mental health treatment at Parthenon from February 27, 2007, to March 6, 2007, at which time she was discharged with multiple diagnoses and a GAF score indicating serious psychological symptoms. She subsequently established psychiatric care with Dr. Okpaku in December 2007. However, because the medical records from Dr. Okpaku were poorly written, it is unclear whether the severity of the claimant's psychological symptoms as assessed at her time of discharge from Parthenon had persisted.

In April 2008, the claimant was evaluated by Dr. Steele, a psychological consultative examiner, who concluded that the claimant would have some work-related mental limitations. However, based on Dr. Steele's report, it does not appear that any such limitations would be so significant as to preclude all work activity. For example, Dr. Steele noted only mild impairment in short-term memory and "some difficulty" in other tasks. The undersigned accepts that the claimant's mental impairments cause difficulty in certain areas of functioning and finds that her residual functional capacity accommodates such limitations. However, the evidence of record does not show that her mental impairments cause limitations to the degree alleged.

Between June 16, 2008, and June 25, 2008, the claimant was hospitalized at Vanderbilt University Medical Center for a central nervous system detoxification program for withdrawal symptoms after being medically noncompliant. Once she was placed back on her medication, she was discharged with a GAF score of sixty, indicating only moderate psychological symptoms.

In early 2009, while living in North Carolina, the claimant sought treatment on a few occasions for exacerbated psychological symptoms. However, it appears that she was not taking her medications as prescribed during this time. On two treatment visits, she was assessed a GAF score indicating serious mental impairment, but on another visit she was given a score indicating only mild impairment. It is interesting to note that these scores

were all assessed in March 2009, suggesting [*sic*]. The undersigned, however, credits the GAF score reflecting mild impairment because it [is] consistent with the claimant's reported activities and the overall evidence of record which shows improved symptoms with medical compliance.

Upon returning to Tennessee, the claimant established care at MHC where she was diagnosed with bipolar disorder, generalized anxiety disorder, and PTSD. She was prescribed Geodon, Anafranil, and Cogentin and subsequently reported that her mood had stabilized and that her medications caused no side effects. She continued to have some ongoing symptoms, especially anxiety, but regularly reported that she was doing well and that her medications were helping. In late 2009, she even started working as a nanny for a friend, attending the YMCA, contemplating going to college, and applying for jobs, which she was encouraged to do by her MHC therapist.

After November 2009, the claimant did not undergo further mental health treatment, but it was noted in February 2010 that her anxiety was stable and controlled and in March 2011 that her ability to concentrate and complete tasks were improved with medication. She was admitted to a rehabilitation program in April 2010, but according to her testimony this was only because a prescribed pain medication had caused her to have an addictive reaction.

As for the hearing testimony, the claimant testified that her seizure disorder is her most disabling impairment. This is inconsistent with her earlier statement that she is able to take her medication beforehand and that this keeps her from having a seizure. She also provided inconsistent testimony regarding the frequency of her seizures, originally stating that she has a seizure every week but later testifying that she has a seizure every couple of weeks and then stating that she has only had two seizures in the past two months. She testified that she may have a seizure every couple of weeks if she skips her medication. As mentioned above, she reported in April 2010 that she had not had a seizure in a year. Based on the claimant's own statements, her seizure disorder appears to be well-controlled. Additionally, the claimant's inability to provide consistent testimony about her seizure disorder, which she claims is her most disabling ailment, diminishes her credibility with regard to her seizures as well as her remaining physical and mental impairments.

The claimant's reported activities also show that her physical and mental impairments do not cause limitations to the degree alleged. The evidence of record shows that she is able to perform daily living activities despite some difficulty and that, during the alleged period of disability, she trained to be an EMT, worked as a waitress and nanny, traveled, attend[ed] the YMCA, and went wakeboarding. These activities reflect on [her] ability to perform physically. Additionally, she has engaged in activities reflecting on her ability to perform mentally. She reported that her hobbies include writing letters, studying holistic medicine and "'how the human brain thinks,'" photoshopping, photography, playing the guitar, and painting. She testified that she likes to read "factual information" and that she is currently reading The History of Western Philosophy. Further, the claimant visits with friends and family, attends church and Alcoholics Anonymous meetings, has applied for jobs, and wants to attend college. Lastly, she testified that she did not have any problems getting along with coworkers and supervisors when she worked as a waitress.

The claimant's involvement in such activities diminishes her testimony regarding her physical and mental limitations. Furthermore, any side effects caused by the claimant's medications are clearly not so limiting as to preclude her from engaging in those activities. During her course of treatment at MHC, she denied that her psychotropic medications caused any side effects.

TR 39-41.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; *Kirk,* 667 F.2d at 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531, *citing Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily

activities, and other evidence.  *See Walters*, 127 F.3d at 531, *citing Bradley,* 862 F.2d at 1227; *cf*

*King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Sec'y of Health & Human*

*Servs.*, 823 F.2d 918, 921 (6th Cir. 1987).  If the ALJ rejects a claimant's testimony as not

credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony

(*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record.  S*ee King*, 742

F.2d at 975.

        As can be seen throughout the ALJ's detailed decision, the ALJ's decision specifically

addresses not only Plaintiff's daily activities, reported pain, treatment, and medication, but also

the objective medical evidence, as well as Plaintiff's testimony and subjective claims, thus,

demonstrating that the ALJ considered the requisite factors.  TR 23-44.

        With regard to Plaintiff's contention relating to her testimony that she worked in a

restaurant for two months before they dismissed her so that she could "focus on her health," as

can be seen in the quoted passage above, the ALJ explicitly discussed Plaintiff's testimony on

this point, stating:

> Regarding her recent work activity, the claimant testified that she
> worked as a waitress for a couple of months three to five months
> ago.  She stated that she worked close to forty hours a week and
> made about two hundred dollars a week.  She testified that her
> employer was very lenient, allowing her to leave early if she
> needed to.  She stated that she had a seizure at work and sometimes
> had to go outside for air.  She further testified that she has had
> problems at all of her jobs because of her health.
>
>                                    . . .
>
> . . . She temporarily worked as a waitress but allegedly stopped due
> to health reasons.  However, the undersigned notes that the
> claimant's physical impairments did not keep her from going
> wakeboarding.

TR 39.

Regarding Plaintiff's contention relating to her testimony that she "very rarely" visits

with friends, and that she only attends church once a month because it is "difficult" for her to sit

through the service, the ALJ explicitly noted Plaintiff's testimony that "she can sit for about

fifteen to thirty minutes at a time" (TR 38) and further stated:

> . . . In her function report, the claimant stated that she goes places
> with friends or to family activities about once or twice a week
> (Exh. 4E-5). However, she testified that she rarely goes out to visit
> with friends and that they usually come to visit her, adding that she
> has "one good friend" who visits her every day. Medical records
> document ongoing complaints of anxiety, and the claimant testified
> that she has problems working around crowds. However, she has
> expressed a desire to go to college to be a holistic practitioner
> (Exh. 22F-1), and she testified that she attends Alcoholics
> Anonymous meetings and church. Additionally, she testified that
> she had no problems getting along with coworkers and supervisors
> at her most recent job at a restaurant. In addition, the claimant
> indicated in her function report that she had never been fired or laid
> off from a job because of not being able to get along with people
> (Exh. 4E-7). Nevertheless, the undersigned credits the claimant's
> subjective complaints regarding her anxiety around people and
> finds that she has moderate limitations in social functioning.

TR 26, *citing* TR 199, 201, 765.

As can be seen, despite Plaintiff's assertion, the ALJ's decision demonstrates that she was

aware of, and explicitly acknowledged, Plaintiff's testimony, *inter alia*, that she had temporarily

worked as a waitress before stopping due to health reasons, that she rarely goes out to visit

friends, that she attends church, and that she can sit for fifteen to thirty minutes at a time. TR 26,

38, 39.

As discussed above, after assessing all of the medical and testimonial evidence, the ALJ

ultimately determined that Plaintiff's statements concerning the intensity, persistence, and

limiting effects of her symptoms were not entirely credible.  TR 39.  In making this determination, the ALJ observed Plaintiff during her hearing, assessed the medical records, and reached a reasoned decision. The ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper.  Plaintiff's contentions regarding the ALJ's consideration of requisite factors, the ALJ's evaluation of her testimony, and the ALJ's overall credibility determination, therefore, fail.

## 2.  Weight Accorded to Opinions of Plaintiff's Treating Psychiatrist and Treating Physician

Plaintiff argues that the ALJ failed to properly evaluate the opinions of her treating psychiatrist, Dr. Samuel Okpaku, and treating physician, Dr. Ifeanyi Obianyo.  Docket No. 16, p. 18, 19.  Specifically, Plaintiff contends that the ALJ's rationale for according the opinions of Drs. Okpaku and Obianyo "little weight" was "speculative and legally erroneous," such that she should have re-contacted them for clarification.  *Id.* at 19.

Regarding the opinion of Dr. Okpaku, Plaintiff argues that the ALJ's reasoning for discounting the opinion - namely, that Dr. Okpaku completed the wrong form, did not give a discernible reason for his assessment, issued an opinion unsupported by treatment records, and gave an opinion on an issue reserved to the Commissioner - was erroneous.  *Id.* at 21, *citing* TR 35.  Plaintiff first contends that regardless of what form was used, "it is clear" that Dr. Okpaku was referring to his treatment of her.  *Id.*  As to the ALJ's statement that Dr. Okpaku "'did not give a discernible reason for his assessment,'" Plaintiff asserts that the ALJ was indicating that she could not ascertain the basis for his opinion, and therefore was required to re-contact Dr. Okpaku for clarification.  *Id.* at 22, 23.  Plaintiff further argues that contrary to the ALJ's assertion, the treatment records at Vanderbilt University Medical Center support Dr. Okpaku's

opinion. *Id.* Plaintiff additionally maintains that, although a medical source does not make the ultimate determination of disability, the ALJ must "'review all of the medical findings and other evidence that supports a medical source's statement that you are disabled,'" and thereafter contends that the ALJ failed to consider that Dr. Okpaku's opinion may have been based, in part, upon his treating relationship with her since December 29, 2007. *Id.* at 23, *citing* 20 CFR § 416.927(d)(1); TR 270. Plaintiff argues that, because Dr. Okpaku was her only treating psychiatrist who rendered an opinion and he saw her long enough to have obtained a longitudinal picture of her mental impairments, the ALJ's improper analysis of Dr. Okpaku's opinion was an "especially harmful" error warranting remand so that Dr. Okpaku can be re-contacted for clarification regarding his opinion. *Id.* at 23-24.

Regarding the opinion of Dr. Obianyo, Plaintiff again argues that the ALJ's reasoning for discounting the opinion - namely, that Dr. Obianyo's treatment notes mainly consisted of Plaintiff's subjective complaints, and that he gave an opinion on an issue reserved to the Commissioner - was insufficient. *Id.* at 24. Plaintiff first asserts that "'opinions from any medical source on issues reserved to the Commissioner must never be ignored.'" *Id.*, *citing* SSR 96-5p. Plaintiff then contends that Dr. Obianyo's reliance on her subjective complaints was not erroneous, as subjective complaints are an "essential diagnostic tool," and further argues that contrary to the ALJ's assertion, Dr. Obianyo's report was based on more than her subjective complaints. *Id.* In particular, Plaintiff notes that: (1) although Dr. Obianyo's treatment notes were "nearly illegible," they contain examination findings of "lumbar tenderness with spasms"; (2) Dr. Obianyo referred her to pain management; and (3) Dr. Watterson's examination findings revealed tender points in her cervical and lumbar spine, as well as elbows. *Id.*, *citing* TR 701,

18

716, 2060, 2066. Plaintiff argues, as above, that given Dr. Obianyo's treating relationship with her, the ALJ committed harmful error by discounting Dr. Obianyo's opinion and instead should have re-contacted him for clarification. *Id.* at 25.

Defendant responds that the ALJ correctly evaluated the opinions of Drs. Okpaku and Obianyo and properly declined to give their opinions controlling weight. Docket No. 19, p. 3-4. Regarding the opinion of Dr. Okpaku, Defendant responds that the ALJ properly accorded his opinion "little weight" because, as the ALJ explained, Dr. Okpaku: (1) used a form for a "dependent child"; (2) did not give a discernible reason for his opinion; (3) issued an opinion unsupported by treatment records of Plaintiff's hospitalization at Vanderbilt University Medical Center, which showed a history of medical noncompliance and improved symptoms with medications; and (4) gave an opinion on whether Plaintiff had the ability to work, which is an issue reserved to the Commissioner and not entitled to any special significance. *Id.* at 4-5, *citing* TR 35. With regard to Dr. Okpaku using the wrong form, Defendant argues that if Dr. Okpaku believed Plaintiff was a "dependent child" despite the fact that she was a 24-year-old adult at the time, it may have influenced his opinion regarding her capacity to work. *Id.* at 4. Defendant further maintains that form reports, which only require the source to check a box or fill in a blank, are entitled to little weight. *Id.* As to the ALJ's statement that Dr. Okpaku did not give a discernible reason for his opinion, Defendant points out that Dr. Okpaku "simply noted" in his opinion two diagnoses and that Plaintiff was currently hospitalized. *Id.*, *citing* TR 35, 803.

Regarding the opinion of Dr. Obianyo, Defendant responds that the ALJ properly accorded his opinion "little weight" because, as the ALJ explained, Dr. Obianyo's opinion: (1) was not supported by his treatment notes, which mainly consisted of Plaintiff's subjective

complaints; and (2) was an opinion on whether Plaintiff had the ability to work, which is an issue reserved to the Commissioner and not entitled to any special significance. *Id.* at 5-6, *citing* TR 29. Defendant maintains that a physician's opinion based upon a claimant's subjective complaints will not be accorded great weight, and also points out that the ALJ noted that Plaintiff told Dr. Obianyo that she had lifted a mattress, which suggests that she did not have the symptoms or limitations indicated by Dr. Obianyo. *Id.*, *citing* TR 28, 1811; 20 CFR §416.927(d)(2).

Defendant additionally responds that the ALJ was not required to re-contact either treating source. *Id.* at 6. Defendant argues that an ALJ's duty to re-contact a treating source arises only when there is inadequate evidence to determine if the claimant is disabled, and argues that the ALJ in the instant case had sufficient and substantial evidence to so determine. *Id.*, *citing* 20 CFR § 416.920(b). Defendant further argues that the evidence the ALJ discussed in her decision shows that the opinions of Drs. Okpaku and Obianyo conflicted with substantial evidence of record and were thus properly accorded little weight. *Id.* at 7, *citing* 20 CFR §416.927(d)(2); SSR 96-2p at 2. Accordingly, Defendant argues that the ALJ properly evaluated the opinions of Drs. Okpaku and Obianyo such that the ALJ's RFC determination was supported by substantial evidence. *Id.*

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion . . . .

(3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion . . . .

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

. . .

20 CFR § 416.927(c) (emphasis added).  *See also* 20 CFR § 404.1527(c).

The ALJ must articulate the reasons underlying her decision to give a medical opinion a specific amount of weight.[3]  *See, e.g.,* 20 CFR § 404.1527(d); *Allen v. Comm'r of Soc. Sec.*, 561

---

[3] There are circumstances when an ALJ's failure to articulate good reasons for the weight accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or

F.3d 646 (6th Cir. 2009); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The reasons must be supported by the evidence and must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the treating source medical opinion and the reasons for that weight. SSR 96-2p.

The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 CFR § 404.1502.

The Sixth Circuit has held that, "[p]rovided that they are based on sufficient medical data, the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002), *quoting Harris v. Heckler*, 756 F.3d 431, 435 (6th Cir. 1985). The ALJ is not bound to accept the findings of a treating physician, however, if those findings are based on insufficient clinical evidence or are inconsistent with other evidence in the record. *Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 652 (6th Cir. 2006), *citing Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); 20 CFR § 416.927(c); 20 CFR § 404.1527(c). If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

---

makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of 20 CFR § 1527(d), by analyzing the physician's contradictory opinions or by analyzing other opinions of record. *See, e.g., Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010); *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-72 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2006).

The ALJ is not bound by a treating physician's statement that a claimant is "disabled," because the definition of disability requires the consideration of both medical and vocational factors. *See, e.g., King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The Regulations provide in part:

> (d) Medical source opinions on issues reserved to the Commissioner. Opinions on some issues, such as the examples that follow, are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner . . . .
>
> > (1) Opinions that you are disabled. We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.
> > . . .
> >
> > (3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . .

20 CFR § 404.1527(d)(1)-(3).

Regarding an ALJ's responsibility to contact a physician for the clarification of an opinion, the Sixth Circuit has held that "an ALJ is required to re-contact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 n. 3. An ALJ is not required to re-contact a physician when the ALJ rejects the limitations recommended by that physician. *Id.*

The ALJ in the instant action discussed the medical and opinion evidence of record (physical) in pertinent part as follows:

> The claimant has a history of occipital neuralgia, fibromyalgia,

23

chronic hypertension, and irritable bowel syndrome (Exhs. 15F, 21F, 68F, and 69F). *Medical records document several visits to her primary care provider, Ifeanyi Obianyo, M.D., throughout 2007, but actual treatment notes do not reflect any significant symptoms and/or limitations (Exh. 65F). The claimant endorsed various symptoms, including radiating low back pain, persistent episodes of diarrhea, insomnia, lower extremity numbness, and abdominal pain (Exh. 65F-2-52). However, Dr. Obianyo did not note any specific objective findings to corroborate the claimant's complaints (Exh. 65F-2-52). Further, on August 24, 2007, the claimant complained of back pain after lifting a mattress, an activity which suggests that, at least up to that point, the claimant's impairments were not causing symptoms and/or limitations to the degree alleged (Exh. 65F-53).*

On August 27, 2007, the claimant underwent an examination at Arthritis Specialists of Nashville, Inc. At the time, her pain medications included Cymbalta, Lyrica, Lortab, Phenergan, and Flexeril (Exh. 19F-6). On examination, she had some myofascial tenderness points in the cervical and lumbar spines and elbows but normal range of motion except for some mild hypermobility of the elbows and knees (Exh. 19F-6). There was no evidence of any synovitis, crepitus, effusion, or muscle weakness (Exh. 19F-6).

It appears that the majority of the claimant's complaints concerned her alleged radiating back pain. However, as mentioned above, diagnostic testing did not show any objective evidence to support her complaints of back pain. The undersigned notes that on December 31, 2007, while seeking treatment for her back pain, the claimant denied having any problems with ambulation (Exh. 21F-2). Additionally, a physical examination was again unremarkable for any significant abnormalities (Exh. 21F-3).

On April 8, 2008, the claimant underwent a consultative examination conducted by Bruce A. Davis, M.D. She complained of a seven-year history of generalized arthralgias, myalgias, spasms, and hypermobility aggravated by activity, position, and cold temperatures (Exh. 23F-2). She reported that her treatment included heat and ice application, Celebrex, Flexeril, Lyric, tramadol, oxycodone, massages, stretches, doctor visits, and the wearing of a back binder (Exh. 23F-2). On examination, Dr. Davis observed decreased range of motion of the thoracolumbar spine but normal range of motion of the neck, upper extremities, hips, and

knees (Exh. 23F-3). Additionally, the claimant had negative bilateral straight leg raises and no evidence of deformity, focal tenderness, nodules, swelling, atrophy, clubbing, cyanosis, lymphadenopathy, or edema (Exh. 23F-3). She had an unsteady tandem maneuver but normal gait and heel-toe maneuvers (Exh. 23F-3). Lastly, she had normal peripheral pulses, deep tendon reflexes, motor strength, and sensation (Exh. 23F-3).

Based on his overall examination and review of medical records, Dr. Davis diagnosed the claimant with fibromyalgia, back pain, and irritable bowel syndrome (Exh. 23F-4). He also diagnosed her with sinus congestion (Exh. 23F-4), but this is not considered to be a severe impairment for purposes of this decision. He opined that she could occasionally lift/carry ten to twenty pounds; frequently lift/carry ten pounds; stand/walk for four to six hours in an eight-hour workday; sit eight hours in an eight-hour workday; perform limited squatting and climbing; and tolerate limited exposure to cold temperatures and heights (Exh. 23F-4).

*Throughout the remainder of 2008, the claimant's main source of medical treatment was from her primary care provider, Dr. Obianyo, whose records primarily document the claimant's subjective complaints rather than any objective findings (Exh. 66F). A "Physician's Certification" dated May 23, 2008, from Dr. Obianyo, notes that the claimant was permanently disabled and unable to be gainfully employed due to hypermobility syndrome with polychondritis which resulted in severe low back, neck, and bilateral knee pain (Exh. 74F-2). However, such an assessment is not supported by Dr. Obianyo's treatment notes, which as previously mentioned, mainly consist of the claimant's subjective complaints. Additionally, while such opinions will be considered, whether the claimant has the ability to work is an issue reserved for the Commissioner and the undersigned is therefore not bound to give any special significance to the source of such an opinion (20 CFR §§ 404.1527 and 416.927).*

. . .

A few days later, on December 14, 2009, the claimant underwent a consultative examination conducted by Albert J. Gomez, M.D. She endorsed symptoms of frequent mood swings, decreased concentration and memory, and a five-year history of chronic pain in multiple joints (Exh. 4F-1). She reported that her pain was

exacerbated with movement, turning of her head, gripping, lifting, bending, standing, and walking but decreased with Coumadin (warfarin) and Percocet. (Exh. 4F-1, 2).

On examination, Dr. Gomez observed the claimant walking with a normal gait and getting on and off the examination table without difficulty (Exh. 4F-2). She had a normal blood pressure and cardiac and respiratory examinations (Exh. 4F-2). She had moderate tenderness to palpation in her left upper extremity but normal range of motion in her shoulders, elbows, and wrists (Exh. 4F-2, 3). She also had normal range of motion in her hips, knees, ankle, and back (Exh. 4F-3). She showed no evidence of any cyanosis, clonus, or edema and had normal pedal pulses, motor strength, deep tendon reflexes, and sensation (Exh. 4F-2, 3). She had negative straight leg raises in both the seated and supine positions and performed all gait maneuvers normally (Exh. 4F-3).

Based on his overall examination, Dr. Gomez diagnosed the claimant with multiple joint pain, acute arm trauma, and bipolar disorder (Exh. 4F-3). He opined that she could occasionally lift twenty to thirty pounds and stand or sit for at least six hours in an eight-hour workday with normal breaks (Exh. 4F-3).

. . .

The claimant continued to seek treatment for her impairments, but by February 24, 2010, her pain had reportedly become "much more manageable" (Exhs. 10F-7; 67F). The undersigned notes that the claimant had been receiving primary care from Basit Aziz, M.D., but was discharged from his care after being prescribed controlled substances from multiple providers (Exh. 10F-25, 26).

On July 8, 2010, the claimant presented to the office of Mark Watson, M.D., for Suboxone initiation after an eight-year history of opiate use (Exh. 14F-2). It was noted that her medical problems included muscular dystrophy, relapsing polychonditis, fibromyalgia, endometriosis, migraines, and interstitial cystitis (Exh. 14F-2). At the time, her medication regimen consisted of Opana and Percocet (Exh. 14F-2). However, it was also noted that she was training to be an EMT (Exh. 14F-2), an activity which reflects on the claimant's credibility regarding the severity of her symptoms and alleged limitations. Dr. Watson diagnosed the claimant with opiate dependence and started her on Suboxone

(Exh. 14F-2).

The claimant continued seeking care from Dr. Watson and remained compliant with Suboxone treatment, but on December 13, 2010, she reported that she had not been taking Suboxone as prescribed (Exh. 14F-5). A few days later, she informed Dr. Watson that she had been having seizures, and she was subsequently prescribed Keppra (Exh. 14F-5, 6).

On January 24, 2011, the claimant complained of headache, muscle aches, and pain in her neck, knees, and ankles, and Dr. Watson questioned whether her chronic pain was a result of Suboxone withdrawal (Exh. 14F-6). The claimant was restarted on Suboxone, and by March 3, 2011, she was feeling better (Exh. 14F-7) . . . .

. . .

Due to complaints of ongoing pain, Dr. Watson referred the claimant for pain management treatment at Comprehensive Pain Specialists in late March 2011 (Exh. 14F-9). She did not start pain management treatment until August 2011, but in the meantime she continued seeking treatment from Dr. Watson. Dr. Watson's treatment notes do not document any significant complaints, and the undersigned notes that on May 9, 2011, Dr. Watson completed a "work excuse" note excusing the claimant from work for only one day (Exh. 14F-12).

. . .

The claimant returned to Comprehensive Pain Specialists on September 19, 2011, to receive the nerve block injections for her occipital neuralgia (Exh. 58F-4). She returned to Dr. Watson's office on September 22, 2011, at which time she reported improvement in her headaches and neck pain (Exh. 61F-5). She complained of some ongoing discomfort in her left shoulder, and on examination she exhibited hyperflexibility of multiple joints, including her elbows, wrists, and fingers (Exh. 61F-6). However, she had full range of motion in the left shoulder without deformity, and X-rays of her left shoulder were normal (Exh. 61F-6). She was prescribed physical therapy (Exh. 61F-6), but it does not appear that any physical therapy records were provided for review.

The undersigned notes that the claimant reported having only a two-month history of left shoulder pain and stiffness after injuring her shoulder while wakeboarding (Exh. 61F-5). That the claimant was able to participate in such a strenuous physical activity strongly diminishes her credibility regarding her alleged inability to work.

No additional records were provided from Dr. Watson documenting further treatment. However, he did provide a medical source statement reflecting significant work-related limitations. For example, Dr. Watson limited the claimant to only occasional lifting of no more than five pounds; standing/walking and sitting each for no more than two hours in an eight-hour workday; no balancing; no more than occasional fine and gross manipulation with either hand; no overhead reaching with the left upper extremity; no exposure to dust, smoke, or fumes (based on the claimant's history of being involved in a fire); and needing to elevate her legs occasional because of varicose veins (Exh. 59F-2). Additionally, Dr. Watson noted that the claimant's pain was "constantly severe enough to interfere with attention and/or concentration" and that she could be expected to miss at least four days of work a month due to her impairments and doctor appointments (Exh. 59F-2). He further stated that the claimant suffered from "extreme fatigue" and that side effects of her prescribed medications would cause a "severe disturbance" in her ability to perform normal routine, work-like functions (Exh. 59F-2, 3).

The undersigned does not credit Dr. Watson's assessment for several reasons. The main reason is that the significant limitations he assessed are not supported by his treatment records. Further, the claimant's reported activities of working in a restaurant and wakeboarding demonstrate that she is not as limited as Dr. Watson's assessment suggests. Additionally, Dr. Watson's records do not reflect any treatment for varicose veins or any impairment that would require a restriction of only occasional fine and gross manipulation with the hands. As discussed above, there is no indication in the medical evidence of record that the claimant's left shoulder pain can be expected to last more than twelve months, and Dr. Watson's restriction of no exposure to pulmonary irritants based on the claimant having posttraumatic stress disorder ("PTSD") after being involved in a fire is not within his realm of expertise. There is nothing in his treatment notes to suggest that

> the claimant's fire exposure resulted in any significant
> cardiovascular or respiratory problems, and in fact, the claimant
> had an extensive history of cigarette smoking and continued to
> smoke throughout the alleged period of disability (Exh. 14F-2).
> For these reasons, the undersigned does not accept Dr. Watson's
> functional assessment.

TR 28-33 (*citing* TR 280-82, 360-97, 434, 437-39, 441, 444, 450-60, 711-18, 725-64, 770-72,

1575-76, 1627-28, 1759-1830, 1831-89, 1980-1974, 1975-2020, 2021-42, 2064) (emphasis

added).

The ALJ then discussed the medical and opinion evidence of record (mental) in pertinent

part as follows:

> As for the claimant's mental impairments, medical records reflect a
> history of bipolar II disorder (depressed), panic disorder with
> agoraphobia, alcohol dependence, and obsessive-compulsive
> personality traits and borderline personality traits with inpatient
> treatment at Parthenon Pavilion ("Parthenon") from February 27,
> 2007, to March 6, 2007 (Exhs. 17F and 35F). It was noted that she
> had previously been under psychiatric care for six or seven years
> for type two bipolar affective disorder and alcohol dependency
> with inpatient treatment in February 2006 (Exh. 17F-2).

> While at Parthenon, the claimant endorsed symptoms of manic
> episodes involving markedly increased energy, racing and
> "jumping" thoughts, rapid speech, and decreased need for sleep;
> and depressed episodes involving decreased energy, pessimistic
> thoughts, middle insomnia, exacerbation of her pain symptoms,
> decreased appetite, feelings of hopelessness, and suicidal thoughts
> (Exh. 17F-2). She also endorsed anxiety with daily panic attacks
> and feelings of paranoia and mistrust of others (Exh. 17F-2).

> On admission, the claimant was given a Global Assessment of
> Functioning ("GAF") score of twenty-five and a score of fifty on
> discharge (Exh. 17F-2). GAF scores are subjective ratings of the
> social, occupational, and psychological functioning of adults. A
> GAF score of twenty-five suggests that one's behavior is
> considerably influence by delusions or hallucinations, serious
> impairment in communication or judgment, or an inability to

function in almost all areas; while a score of fifty suggests serious symptoms or any serious impairment in social, occupational, or school functioning (Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision).

At the time of her admittance to Parthenon, the claimant had been taking Geodon, diazepam, Adderall, and clomipranine (Exh. 17F-3).  On discharge, she was additionally prescribed trazodone, Cymbalta, and Abilify, as well as some pain medications (Exh. 17F-5).

*The claimant subsequently established care with psychiatrist Samuel Okpaku, M.D., on December 29, 2007.  The specifics of Dr. Okpaku's treatment of the claimant were not clear due to his treatment notes being poorly written.  However, the treatment notes showed that the claimant regularly met with Dr. Okpaku in 2008 and 2009 (Exh. 2F).*

On April 7, 2008, the claimant underwent a psychological consultative examination conducted by Kathryn Steele, Psy.D.  Dr. Steele noted that the claimant's thinking appeared organized but that her thought content was "self-pitying" (Exh. 22F-2).  She also noted that the claimant denied suicidal ideation but reported homicidal ideation without intent (Exh. 22F-2).  The claimant denied having hallucinations, and there was no evidence of delusional thinking (Exh. 22F-2).  She admitted to a history of alcohol and marijuana abuse (Exh. 22F-1).  At the time of the evaluation, the claimant's psychotropic medications included Cymbalta, Klonopin, and amitriptyline (Exh. 22F-2).

Based on her overall evaluation, Dr. Steele diagnosed the claimant with polysubstance abuse in partial remission and borderline personality features (Exh. 22F-3).  She also noted a "rule out" diagnosis of generalized anxiety disorder (Exh. 22F-3).  She assessed a GAF score of sixty-eight, which indicates only mild symptoms or difficulty in social, occupational, or school functioning; but generally functioning pretty well and having some meaningful relationships (Exh. 22F-3; Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision).

Dr. Steele opined that the claimant would have no difficulty understanding detailed directions but would have some difficulty with remembering instructions as a result of her prescribed

medication (Exh. 22F-3). However, Dr. Steele found only mild impairment in the claimant's short-term memory and intact historical memory functioning (Exh. 22F-3). Dr. Steele also found no indication that the claimant would have difficulty maintaining socially appropriate standards of conduct but noted that she would have some difficulty sustaining concentration and completing tasks and responding appropriately to changes in a routine or in the work setting (Exh. 22F-3). She opined that the claimant would have the ability to be aware of simple hazards and to take adequate precautions against them but noted that she might become increasingly anxious in situations that vary from routine responses (Exh. 22F-3).

*Between June 16, 2008, and June 25, 2008, the claimant was hospitalized at Vanderbilt University Medical Center after Dr. Okpaku ordered that she be placed on a central nervous system detoxification program for withdrawal symptoms (Exh. 1F-1, 2).* It was noted that her medical compliance had been inconsistent and that she had stopped taking Klonopin two days prior to her admittance (Exh. 1F-1, 2). She was given an initial GAF score of twenty-four, A [*sic*] indicating that her behavior was considerably influenced by delusions or hallucinations, serious impairment in communication or judgment, or an inability to function in almost all areas (Exh. 1F-1; Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision).

While hospitalized, the claimant was a "poor attendee" at group therapy sessions, but it was noted that she eventually "became appropriate" and interacted with other patients (Exh. 1F-3). She was discharged with a diagnosis of schizoaffective disorder with substance dependence and prescribed Zyprexa and Celexa (Exh. 1F-3). She was also prescribed pain medications for chronic pain syndrome (Exh. 1F-1, 3). Her GAF score on discharge was a sixty, indicating only moderate symptoms or moderate difficulty in social, occupational, or school functioning (Exh. 1F-1; Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision).

*The undersigned noted that on June 24, 2008, Dr. Okpaku completed a Physician's Statement in which he noted that the claimant was unable to work. (Exh. 27F). However, it appeared that he completed the wrong form as the questions asked refer to a "dependent child" (Exh. 27F). Additionally, Dr. Okpaku did not give a discernable [sic] reason for his assessment, and such a*

> *restriction is not supported by treatment records of the claimant's*
> *hospitalization at Vanderbilt University Medical Center, which*
> *reflect a history of medical noncompliance and improved*
> *symptoms with medication. Lastly, while such opinions will be*
> *considered, whether the claimant has the ability to work is an issue*
> *reserved for the Commissioner and the undersigned is therefore*
> *not bound to give any special significance to the source of such an*
> *opinion (20 CFR §§ 404.1527 and 416.927).*
>
> The claimant continued seeking treatment from Dr. Okpaku (Exh.
> 2F), but in early 2009 she relocated to North Carolina with her
> husband . . . .

TR 33-35 (*citing* TR 232-34, 239-71, 476-87, 765-67, 803, 854-961) (emphasis added).

Additionally, as noted above, the ALJ also discussed the medical evidence of record, both

physical and mental, when determining Plaintiff's credibility. TR 39-41.

With regard to the weight the ALJ accorded to the opinion evidence and the reasons

therefor, the ALJ stated:

> As for the opinion evidence, significant weight is given to the
> assessments of Drs. Gomez and Davis, the consultative examiners,
> as discussed above. Both of these assessments reflect limitations
> that allow for the performance of light work. This is consistent
> with the overall evidence of record, which reflects improved
> symptoms with medical compliance, physical examinations which
> consistently showed no significant abnormalities, and the
> claimant's reported activities. However, the undersigned does not
> credit Dr. Davis's opinion that the claimant is limited in her ability
> to squat and climb. As mentioned above, no medically
> determinable impairments were found regarding the claimant's
> cervical and lumbar spines, right knee, right hip, and left shoulder,
> and she recently went wakeboarding.
>
> The medical source statements provided by Drs. Obianyo and
> Watson are given little weight. These assessments and the reasons
> for the weight accorded were discussed in detail above.
>
> Little weight is also given to the State agency medical consultants'
> opinions that the claimant does not have any severe physical

impairments (Exhs. 6F, 13F, and 29F) and that she can perform a full range of medium work (Exh. 24F) as neither of these opinions are well-supported by the evidence of record as a whole.

As for the mental assessments, significant weight is given to the opinion of Dr. Steele, including her GAF score, inasmuch as it is consistent with the claimant's residual functioning capacity. She opined that the claimant will have no difficulty understanding detailed directions, maintaining socially appropriate standards of conduct, and recognizing and taking adequate precautions against simple hazards. However, Dr. Steele found that the claimant will have some difficulty with remembering instructions, sustaining concentration, completing tasks, responding appropriately to changes in a routine or in a work setting, and adapting to situations that vary from routine responses. The limitations set forth in the claimant's residual functional capacity are within the restrictions assessed by Dr. Steele.

Significant weight is also given to the assessments of the State agency psychological consultants. These assessments reflect that the claimant can perform simple tasks, interact with the general public and people within the work setting, and adapt to changes (Exhs. 8F, 12F, 26F, and 30F). However, the undersigned credits the more restrictive limitations of agency consultant Edward L. Sachs, Ph.D., that the claimant can interact only infrequently or on a one-to-one basis with the general public and adapt to only gradual or infrequent changes (Exh. 8F-3; see also Exh. 12F).

The assessments of Dr. Steele and the State agency consultants are generally consistent with the claimant's reported activities and the evidence of record as a whole, which reflects improved and stable symptoms with medical compliance. However, given the claimant's ongoing problems with anxiety, she is limited to performing no more than simple, routine, repetitive tasks and interacting with coworkers, supervisors, and the public on no more than an occasional basis.

The medical source statement provided by Dr. Okpaku, the claimant's psychiatrist, is given little weight. This assessment and the reasons for the weight accorded were discussed in detail above.

TR 41-42 (*citing* TR 295-98, 313-16, 431, 432, 777-84, 799-802, 809-12, 813-16).

Drs. Obianyo and Okpaku were Plaintiff's treating physicians, a fact that would justify the ALJ according greater weight to their opinions than to others, as long as their opinions were supported by medically acceptable clinical and laboratory diagnostic techniques, and consistent with the evidence of record. As can be seen, however, Dr. Obianyo's and Dr. Okpaku's opinions contradict other substantial evidence in the record. As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 CFR § 416.927(d)(2); 20 CFR § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* When the opinions are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 CFR § 416.927(e)(2).

As has been demonstrated in the ALJ's decision recounted above, the ALJ specifically discussed the medical source statements completed by Dr. Obianyo and Dr. Okpaku, articulated the weight accorded to the opinions, and explained her rationale for the weight she accorded thereto. TR 28-42. When opinions are inconsistent with each other or parts of the opinions are insufficiently supported, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 CFR § 416.927(e)(2). Furthermore, the Regulations provide that, because the ultimate determination of Plaintiff's ability to work is an issue reserved to the Commissioner, the ALJ is not bound to give any special significance to a statement by a medical source that the claimant is "disabled" or "unable to work." 20 CFR § 404.1527(d)(1)-(3); *see also King*, 742 F.2d at 973. Because the opinions of Drs. Obianyu and Okpaku were inconsistent with other substantial evidence in the record, the Regulations do not mandate that

34

the ALJ accord their evaluations controlling weight. Accordingly, Plaintiff's argument fails.

With regard to Plaintiff's argument that the ALJ should have re-contacted Dr. Obianyo and Dr. Okpaku for clarification regarding the reasoning for their opinions, the ALJ was not required to re-contact Dr. Obianyo and Dr. Okpaku because: (1) Plaintiff has the burden of proving he is disabled (*Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275, *citing Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001)); (2) the ALJ has discretion to determine whether additional evidence is necessary to make the disability determination (*Id.*); and (3) the duty to clarify or seek additional evidence arises only if the evidence available to the ALJ is inadequate to make a decision (*See Poe*, 342 F. App'x at 156 n. 3, *citing* 20 CFR § 404.1512(e)). As has been demonstrated, the ALJ in the case at bar considered the evidence of record, reached a reasoned decision, and explained the basis therefor. The ALJ had sufficient evidence upon which to base her decision; therefore, she did not need to re-contact Drs. Obianyo and Okpaku to seek clarification or obtain additional evidence, and Plaintiff's argument on this point fails.

With regard to Plaintiff's argument that "[a]n ALJ has a duty to develop a full and fair record, regardless of whether the individual is represented by an attorney" (Docket No. 16, p. 18, *citing Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 344 (6th Cir. 2008)), the record, as cited and discussed above, demonstrates that the ALJ specifically addressed in great detail not only the medical evidence, but also Plaintiff's testimony and her subjective claims, clearly indicating that these were considered. TR 28-42. It is clear from the ALJ's detailed, articulated rational that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that were inconsistent with Plaintiff's allegations. This is within the ALJ's province. Because the ALJ developed the evidence and adequately explained the reasons and

basis for her conclusions, and because the ALJ's findings are supported by "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion," substantial evidence exists, and the decision of the ALJ must stand.

### 3. Residual Functional Capacity ("RFC")

Plaintiff maintains that because the ALJ failed to properly evaluate the opinions of her treating physician and treating psychiatrist, the ALJ rendered a RFC determination that is not supported by substantial evidence. Docket No. 16, p. 16. Defendant responds that because the ALJ correctly evaluated the opinions of Drs. Okpaku and Obianyo and properly accorded them little weight, the ALJ's RFC determination was supported by substantial evidence. Docket No. 19, p. 4-8.

"Residual Functional Capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 CFR Pt. 404, Subpt. P, App. 2 § 200.00(c). With regard to the evaluation of physical abilities in determining a claimant's RFC, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

20 CFR § 404.1545(b).

With regard to the evaluation of mental abilities in determining a claimant's RFC, the Regulations state:

When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting may reduce your ability to do past work and other work.

20 CFR § 404.1545(c).

The ALJ in the case at bar ultimately determined that Plaintiff retained the RFC for light work as defined in 20 CFR 416.967(b) with additional limitations. TR 27. The ALJ explained:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) that is limited to occasional lifting and/or carrying of twenty pounds; frequent lifting and/or carrying of ten pounds; standing and/or walking for four hours in an eight-hour workday; sitting for eight hours in an eight-hour workday; requiring a sit/stand option; avoiding cold temperatures and unprotected heights; performing only simple, routine, repetitive tasks; interacting with coworkers, supervisors, and the public on no more than an occasional basis; and tolerating only infrequent and gradual workplace changes.

*Id.*

In so finding, the ALJ considered, *inter alia*, Plaintiff's testimony, including allegations of disabling limitations (TR 40-41) and Plaintiff's daily activities (TR 41), as well as the medical evidence relating to Plaintiff's physical and mental health (TR 28-42). As has been demonstrated, the ALJ evaluated the medical and testimonial evidence of record, including the opinions of Plaintiff's treating physician and treating psychiatrist, and ultimately determined that Plaintiff retained the RFC to perform light work with additional limitations. TR 27. The ALJ properly evaluated the evidence in reaching this RFC determination, and the Regulations do not

require more.

**4.  Incomplete Hypothetical Question**

Plaintiff argues that the ALJ's determination at step five of the sequential evaluation process that there existed a significant number of jobs in the national economy that Plaintiff could perform, lacks the support of substantial evidence because the VE's testimony upon which the ALJ based her determination was rendered in response to an "incomplete hypothetical question."  Docket No. 16, p. 24.  Specifically, Plaintiff maintains that the hypothetical question was incomplete "due to the ALJ's errors in evaluating Plaintiff's RFC and credibility . . . ."  *Id.* at 25.  In particular, Plaintiff asserts that the hypothetical question asked to the VE "could have contained additional limitations" if the ALJ had "properly" re-contacted Dr. Obianyo and Dr. Okpaku.  *Id.*

As discussed above, Defendant argues that the ALJ's RFC and credibility determinations were proper.  Docket No. 19, p. 7-11.  In response to the instant statement of error specifically, Defendant argues that the ALJ's hypothetical questions properly incorporated the impairments and limitations that the ALJ deemed credible, such that the ALJ could appropriately rely upon the VE's testimony regarding the existence of a significant number of jobs in the national economy that would be appropriate for Plaintiff to perform given the restrictions found by the ALJ.  *Id.* at 11.  Defendant additionally argues that the ALJ had no duty to re-contact Dr. Obianyo or Dr. Okpaku, so Plaintiff's argument that the ALJ's hypothetical "could have contained additional limitations" if the doctors were re-contacted is irrelevant.  *Id.*

As explained above, the Commissioner has the burden at step five of the sequential evaluation process of establishing the claimant's ability to work by proving the existence of a

significant number of jobs in the national economy that the claimant could perform, given his or her age, experience, education, and residual functional capacity. 20 CFR §§ 404.1520, 416.920. *See also Moon*, 923 F.2d at 1181. The Commissioner's burden at step five can be satisfied by relying on the grid rules only if Plaintiff is not significantly limited by nonexertional impairments, such as mental limitations, manipulative limitations, or environmental limitations. *Abbot v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990).

In the presence of nonexertional limitations that would preclude the application of the grid, "expert testimony would be required to satisfy the Secretary's burden of proof regarding the availability of jobs which this particular claimant can exertionally handle." *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 531 (6th Cir. 1983). In other words, the ALJ may rely on the testimony of a VE in response to a hypothetical question as substantial evidence of the existence of a significant number of jobs that the claimant is capable of performing as long as the hypothetical question accurately represents the claimant's credible limitations. *See Varley*, 820 F.2d at 779, *quoting O'Banner v. Sec'y of Health, Ed. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978).

As discussed above, the ALJ's RFC and credibility analyses were proper. Plaintiff's argument that the ALJ's hypothetical question was "incomplete" "due to the ALJ's errors in evaluating Plaintiff's RFC and credibility," therefore fails. Additionally, because the ALJ was not required to re-contact Dr. Obianyo or Dr. Okpaku, as further discussed above, Plaintiff's argument that the hypothetical question asked to the VE "could have contained additional limitations" had the ALJ "properly" re-contacted Dr. Obianyo and Dr. Okpaku also fails.

Because the hypothetical question upon which the ALJ ultimately rendered her decision

accurately represented Plaintiff's credible limitations, the ALJ properly relied on the VE's answer to that hypothetical question to prove the existence of a significant number of jobs in the national economy that Plaintiff could perform. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987); *Varley*, 820 F.2d at 779. Accordingly, Plaintiff's claim fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72.

_____
E. CLIFTON KNOWLES
United States Magistrate Judge